# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN J. CASTELLANO,

                    Plaintiff,

v.                                                    Case No. 17-CV-598-JPS

REBECCA MAHIN,

                    Defendant.                        **ORDER**

## 1.    INTRODUCTION

On June 13, 2017, the Court screened Plaintiff's Amended Complaint (his operative pleading). (Docket #13).[1] It allowed him to proceed on the theory that Defendant imposed "conditions of probation beyond those permitted by the applicable criminal judgment(s) or other valid orders imposing the same, or the imposition of existing conditions in an unconstitutional manner, in violation of Plaintiff's rights under the First, Fourth, Eighth, and Fourteenth Amendments." *Id.* at 4. On December 1, 2017, Defendant moved for summary judgment. (Docket #25). Plaintiff responded to the motion on January 11, 2018, and Defendant replied on January 26, 2018. (Response, Docket #35; Reply, Docket #40). For the reasons explained below, Defendant's motion must be granted.

---

[1]On January 11, 2018, Plaintiff filed a "Second Amended Pleading." (Docket #38). The document did not become his operative pleading, for two reasons. First, he did not seek the Court's leave to amend. Fed. R. Civ. P. 15(a)(2). Second, even if he had properly sought leave, it would be denied. The attempted amendment comes far too late, long after the close of discovery and, indeed, after the filing of Defendant's summary judgment motion. *Gandhi v. Sitara Cap. Mgmt., LLC*, 721 F.3d 865, 868-69 (7th Cir. 2013) (leave to amend may be denied if "the moving party unjustifiably delayed in presenting its motion to the court").

## 2.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).  A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 3.  BACKGROUND

### 3.1  Plaintiff's Failure to Dispute the Material Facts

The relevant facts are undisputed because Plaintiff failed to dispute them. In the Court's scheduling order, entered June 23, 2017, Plaintiff was warned about the requirements for opposing a motion for summary judgment. (Docket #17 at 2-3). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. In Defendant's motion for summary judgment, she too warned Plaintiff about the requirements for his response as set forth in Federal and Local Rules 56. (Docket #25). He was provided with additional copies of those Rules along with Defendant's motion. *Id.* at 3-9. In connection with her motion, Defendant filed a supporting statement of material facts that complied with the applicable procedural rules. (Docket #27). It contained short, numbered paragraphs concisely stating those facts which Defendant

proposed to be beyond dispute, with supporting citations to the attached evidentiary materials. *See id.*

As provided in Civil Local Rule 56, Plaintiff's responsive materials needed to contain "a concise response to the moving party's statement of facts," including "a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" *See* Civil L. R. 56(b)(2). Plaintiff's January 11 response does not comply with this rule. Plaintiff's brief includes a two-page section entitled "Statement of Facts," which states a few facts without citation to any evidence. (Docket #35 at 2-3). Plaintiff also provided a separate statement of additional facts. (Docket #36). Many of those facts are not accompanied by a citation to evidence. *See, e.g., id.* ¶¶ 5, 8, 9, 14. A few of Defendant's proposed facts are occasionally cited or referenced, but the entire body of facts is not addressed in the manner required by Civil Local Rule 56(b)(2). *See, e.g., id.* ¶¶ 10, 21. In sum, Plaintiff has not filed anything approaching a response to Defendant's statement of facts as contemplated by the Local Rules.

Despite being twice warned of the strictures of summary judgment procedure, Plaintiff ignored those rules by failing to properly dispute Defendant's proffered facts in the correct form, and with citations to relevant, admissible evidence. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. In short, judges are not

like pigs, hunting for truffles buried in briefs.") (citations and quotations omitted). Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer, and it cannot delve through the record to find favorable evidence for him. Thus, the Court will, unless otherwise stated, deem Defendant's facts undisputed for purposes of deciding her motion for summary judgment. *See* Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants).[2]

As noted above, Plaintiff did offer a statement of additional facts. The Court cannot accept those proposed facts, however, to the extent they are contradicted by Defendant's now-undisputed facts. Further, any facts which are not contradicted are still subject to dispute by Defendant via citation to relevant evidence. *See id.* 56(b)(3)(B); (Docket #41). Finally, many of the additional facts do not comport with Local Rule 56; most are lengthy amalgamations of different facts, and others cite no evidence or irrelevant evidence. *See* Civ. L. R. 56(b)(2)(B)(ii). Thus, the set of Plaintiff's additional facts which may be properly considered by the Court is extremely limited. This is reflected in the Court's recitation of the facts below.

---

[2]This discussion should be very familiar to Plaintiff. Not three months ago, the Court ruled upon a summary judgment motion filed by a defendant in another case brought by Plaintiff. *See John J. Castellano v. Jennifer Spotts*, 16-CV-1248-JPS (E.D. Wis.), Docket #59. His submissions in response to that motion likewise failed to include a coherent response to the movant's statement of facts. *Id.* at 2-4. The Court is disappointed that Plaintiff failed to heed its instructions and carefully review the rules of procedure prior to filing his response to the instant motion.

### 3.2 Relevant Facts

The following facts are material to the resolution of Defendant's motion.[3] In 1993, Plaintiff sexually assaulted his then-wife's 14-year-old sister. His offense included having sexual intercourse with his victim and he was arrested after trying to trade sexually explicit photographs and videos of his crime for other child pornography. In 2000, he was convicted of one count of second degree sexual assault of a child and three counts of sexual exploitation of a child, and sentenced to four consecutive 10-year prison terms. In 2011, Plaintiff was granted discretionary parole. That parole was revoked and Plaintiff was returned to prison after he violated his parole rules by traveling across the country, changing his residence, and accessing the internet, all without his agent's permission and all within about a month of his release from prison.

In 2013, in preparation for Plaintiff's next parole grant, Plaintiff's agent at the time requested and received approval to place Plaintiff on a "discretionary" GPS tracking program. Discretionary GPS refers to the use of GPS monitoring (*i.e.*, requiring an offender to wear a GPS tracking device) as a tool of supervision of offenders who are on active supervision.[4] Plaintiff's placement on a discretionary GPS tracking program was based

---

[3]All of the facts are drawn from Defendant's statement of facts, (Docket #27), unless otherwise noted.

[4]Discretionary GPS monitoring of offenders who are on active supervision is different from the GPS monitoring governed by Wis. Stat. § 301.48. That law mandates that the Department of Corrections ("DOC") maintain lifetime GPS tracking—*i.e.*, even after the underlying criminal sentence has been served—for individuals who meet certain statutory criteria, *see id.* § 301.48(2)(a) & (b), and allows DOC to monitor individuals who do not satisfy the statutory criteria if DOC assesses the individual's risk using a "standard risk assessment instruction" and determines GPS tracking is appropriate, *id.* § 301.48(2g).

on a determination that Plaintiff presented a high risk of sexual re-offense, which in turn was based on Plaintiff's prior failed parole. This determination was also based on evidence that Plaintiff has deviant sexual interests and a high level of sexual preoccupation. Specifically, DOC records indicate that Plaintiff wrote letters containing extremely explicit stories involving violent rapes of young children while incarcerated in 1996; he contemplated soliciting a pen pal to discuss erotic fantasies, incest, and other explicit subjects in 1996; he received a conduct report in 2002 after a sergeant observed him repeatedly inserting a conditioner bottle into his rectum in front of another inmate; he received a major conduct report for possession of pornographic material in 2005; and in 2011, after completing sex offender treatment but before he was released on parole the first time, he wrote a letter to another sex offender in which he described himself as a "way over the top" sex freak, and in which he provided explicit details about his deviant sexual preferences.

Plaintiff's initial placement on discretionary GPS tracking was effective for ninety days. The placement was then renewed over his objection in September 2013. The reason for the renewal was that Plaintiff had not yet decreased his risk by showing significant progress in his sex offender treatment programing.

On June 18, 2013, Plaintiff was again released on parole. His agent at the time was Defendant. Defendant explained Plaintiff's parole rules to him and he refused to sign them. Defendant explained that he was required to follow his rules whether he signed them or not. Although one of his rules explicitly required that he initial each written rule, Defendant did not seek to revoke Plaintiff when he refused to sign or initial the rules. Nor did Defendant threaten or "intimidate" Plaintiff when he refused to sign his

rules. The purpose of the rule requiring Plaintiff to initial each of his rules in writing was to show that he had read them and avoid a later claim that he was unaware of a given rule.

Plaintiff's rules also required that he seek, obtain, and maintain employment as directed by his agent; that he neither possess nor view any sexually explicit material without his agent's permission; that he neither purchase, possess, nor use a computer or other device capable of accessing the internet without his agent's permission; that he not enter any area frequented by persons under age 18 without his agent's permission; and that he fully cooperate regarding the GPS tracking program.

Plaintiff resided in Veteran's Administration ("VA") housing for the duration of this period of parole. He was enrolled in the VA's Domiciliary Care for Homeless Veterans ("DCHV") program. The VA facility where Plaintiff resided included a library, and Defendant permitted Plaintiff to use computers in that library for the limited purpose of searching for employment. Limiting a sex offender's use of computers is a standard sex offender rule of supervision that is often used, as in Plaintiff's case, to prohibit viewing of sexually explicit material that is ubiquitous and easy to find on the internet.

Plaintiff initially told Defendant and VA staff that he would refuse to accept jobs offering less than $15.00-$20.00 per hour, but he eventually obtained temporary factory employment and was working somewhat regularly before he was taken into custody in October 2013, discussed further below. Defendant encouraged Plaintiff to apply for several jobs through the DCHV program. If Defendant prohibited or discouraged Plaintiff from searching for any particular job, it was likely because the job would require him to enter places frequented by children while he was

unsupervised. Requiring child sex offenders like Plaintiff to be chaperoned as a condition of any employment that may involve incidental contact with children is a common rule that is designed to protect the public. Plaintiff also expressed an interest in attending school before he was revoked, but he was advised that he could not attend school and be in the DCHV program because the program was intended to help veterans find employment.

Plaintiff was referred for sex offender treatment programming upon the commencement of this period of parole. He was late for his first session and was not allowed to participate, and he was asked to leave his second session after he fell asleep during group. He was reportedly not an active participant in later groups, and according to program facilitators, he often appeared to have difficulty staying awake.

In mid-July 2013, Plaintiff reported to Defendant that he had been to a public library in West Allis. Defendant warned him that doing so without her permission would violate the rule regarding potential contact with minors. Plaintiff did not have prior permission to use the public library in West Allis, and as noted above, Plaintiff had access to a library at the VA center where he resided.

Plaintiff was taken into custody twice during this period of parole, not counting the custody leading to his revocation. Both arrests were based on apparent violations of his GPS program. First, on June 22, 2013, within a week of his release from prison, Plaintiff was arrested after leaving his designated "home zone" within the VA grounds. Plaintiff denied doing so intentionally. Although Defendant and VA staff suspected at the time that Plaintiff was intentionally testing the boundaries of the GPS program,

Plaintiff was released back to GPS supervision on June 27, 2013 after VA staff agreed to accept him back into the DCHV program.

Second, Plaintiff was arrested on September 14, 2013. He had been at an approved work site and had lost his GPS signal. He did not regain his signal for over two hours until he returned home. Defendant investigated and concluded that Plaintiff appeared to be attempting to follow his GPS rules. He was released on September 17, 2013 and warned to be careful to re-obtain a GPS signal after leaving enclosed areas such as work sites.

These arrests led to brief incarcerations at the Milwaukee County Jail (the "Jail"). Defendant had no control over or responsibility for Plaintiff's medical care while he was in the Jail. Neither did she have any responsibility for making sure that Plaintiff was allowed to take his HIV-AIDS medications with him when he was taken into custody and transported to the Jail because she did not personally take Plaintiff into custody in either instance.

On October 15, 2013, Defendant was notified by VA staff that Plaintiff had been observed by other VA residents using the VA library computers to view pornographic materials. Specifically, according to two VA residents, on October 2, 2013, Plaintiff used a cell phone to take photographs of a computer screen displaying pictures of naked women and men in sexual poses. One resident reported telling Plaintiff such material was "poison," to which Plaintiff responded "it's not illegal." The resident repeated that it was poison and stated "it's illegal here" and Plaintiff replied that he was lonely. A VA library technician also observed Plaintiff using a cell phone to take pictures of anatomical drawings of female genitalia on his computer screen in early September, at which time Plaintiff said he was thinking of pursuing a career in gynecology. The same technician also

reported catching Plaintiff watching a pornographic video in late September. Plaintiff initially denied such actions when questioned by Defendant, but admitted them after Defendant told him she had talked to several eyewitnesses. Plaintiff was taken into custody by the police at Defendant's direction on October 16, 2013.

On October 22, 2013, Plaintiff was terminated from the DCHV program for violating VA policies regarding computer use. DOC then decided to initiate revocation proceedings, alleging Plaintiff violated his parole rules by: (1) using the internet to view sexually explicit materials; (2) possessing a cell phone with a camera without the approval of his agent and using the camera to take pictures of sexually explicit material; (3) failing to provide truthful and accurate information to his agent regarding the use of the internet to view sexually explicit materials (in his statement to Defendant, Plaintiff admitted he had lied about viewing pornography); and (4) getting terminated from the VA's DCHV program for violating VA policies.

Defendant wrote a meticulous Revocation Summary explaining her recommendation that Plaintiff's parole be revoked and that he be returned to prison. In addition to the circumstances already discussed above, Defendant noted that during this period of parole, Plaintiff had admitted to printing materials to assist him in "beating" a polygraph examination. Defendant also explained that although Plaintiff had completed sex offender treatment while previously incarcerated, his treatment provider had opined that he may have been better served by a longer-term sex offender treatment program.

Finally, Defendant summarized the seriousness of Plaintiff's violations as follows:

Upon his release to the community, [Plaintiff] refused to sign his parole rules. Furthermore, he submitted requests for administrative review complaining that he felt the rules were overbroad and should not apply to him. He continuously pushed the boundaries of his rules and received numerous warnings during this short period of parole. This agent did a thorough review of [Plaintiff]'s history and came to the conclusion that he has serious issues with sexual deviancy, and sexual preoccupation. He was encouraged many times by his agent to address these issues with her and in his treatment group. [Plaintiff] refused to do so. He steadfastly denied any problems- reporting at various times that he could not masturbate due to physical health issues, he was no longer interested in sex because of his newly rekindled Catholic faith, and that he was so stressed out and worried by his parole conditions that he did not have time to have any sexual interests. When his current violation behavior became known, a statement was taken from [Plaintiff]. He began by denying the allegations, but did eventually take responsibilty [sic] for the behavior. He reported that the sexually explicit materials he found on the internet involved adult subjects. He also admitted using a cell phone camera to photograph the sexually explicit photos. He reported he later threw the camera phone away because he was feeling guilty. Since the photos of the sexually explicit material was not available to review, it is impossible to determine just what he was viewing. He further reported that he did not talk to his agent about the sexually explicit materials because he "did not think she would understand". This agent hypothesizes that it is less that he felt his agent wouldn't understand, and more that he was worried that his agent would make him discontinue this behavior. It is of interest to this agent that [Plaintiff] again brought forth a formal Request for Administrative Review dated 9/30/13 in which he complained that he was not allowed to use the internet or go to the library to use computers for other than job search. This is well after the date that [Plaintiff] has admitted to regularly beginning to access SEM [sexually explicit material] on the VA library computer. [Plaintiff]'s behavior shows that he has no insight into the fact that his behavior of using SEM is not in the best interest of his

rehabilitation. He has shown continuing cognitive distortions regarding his sexual offense in conversation with his agent. For instance, he has made the argument that he should not have been charged with anything other than prostitution for his current offense because his victim "consented". Although he supposedly completed SO-2 he does not show any insight into the wrongfulness of his having groomed a medically fragile 14 year old girl, who he should have had a trusted adult status with, into engaging in intrusive sexual acts which he filmed and attempted to trade. He does not see himself as a sex offender, and therefore makes excuses for himself as to why he does not need to follow the rules. This is an extremely dangerous attitude. It is imperative that [Plaintiff] be made to understand that his behavior will not be tolerated in the community. A clear message needs to be sent to [Plaintiff] by returning him to prison until he is willing to abide by conditions set forth to protect the community. Failure to revoke at this time would unduly depreciate these violations.

(Docket #28-1 at 8-9).

Defendant had recommended a sentence of approximately six years. After a revocation hearing, an administrative law judge agreed with Defendant that revocation was appropriate, and concluded that a period of re-confinement of four-and-a-half years was appropriate, in part to maximize the chance Plaintiff would undergo long-term sex offender treatment (known as the SO-4 program, as opposed to the shorter SO-2 program). Plaintiff remains incarcerated pursuant to that revocation decision.

4.      ANALYSIS

As noted above, Plaintiff was permitted to proceed under the First, Fourth, Eighth, and Fourteenth Amendments relating to his complaints about Defendant's supervision. As explained in his Amended Complaint,

Plaintiff maintains that Defendant violated his constitutional rights in eight specific instances:

1) "Intimidating" him by including in his parole rules a provision which states that he must read, and place his initials next to, each rule, in violation of the First Amendment;

2) Falsely alleging that he refused to sign his parole rules in her revocation summary (quoted above), in violation of the First Amendment;

3) Denying him access to a public library, and thereby access to the courts, in violation of the First Amendment;

4) Infringing on his right to "access information and access to the [c]ourts" when Defendant denied him access to the internet or possession of any computer or internet-capable device, other than to search for employment, in violation of the First Amendment;

5) Denying him the ability to work in his previous occupations which "had no bearing on the dynamics of his crime," and denying him leave to attend a technical college without a chaperone, in violation of the First Amendment;

6) "Illegally tethering him indefinitely" to a GPS location monitoring device, "sans protections provided under Wis. Stat. § 301.48(2g)," in violation of the Fourth Amendment;

7) Engaging in cruel and unusual punishment, and "being medically indifferent and grossly negligent," when Defendant had him arrested for GPS-related violations, thereby depriving him of his HIV-AIDS medications, in violation of the Eighth Amendment; and

8) Seeking a revocation sentence of four-and-a-half years so that he would have the opportunity to complete the SO-4 program, in violation of the Equal Protection Clause of the Fourteenth Amendment.

(Docket #12 at 1-3).

The Court will group the claims in accordance with the amendment cited and address them below. It must note at the outset, however, that parole agents are generally afforded "broad discretion" in their role of ensuring parolees abide by the conditions of parole and progress toward prosocial behavior. *Morrissey v. Brewer*, 408 U.S. 471, 479 (1972); *see also Gagnon v. Scarpelli*, 411 U.S. 778, 784 (1973) ("Because the probation or parole officer's function is not so much to compel conformance to a strict code of behavior as to supervise a course of rehabilitation, he has been entrusted traditionally with broad discretion to judge the progress of rehabilitation in individual cases, and has been armed with the power to recommend or even to declare revocation."). These teachings of the Supreme Court color the Court's analysis below, as they compel the Court to give some deference to Defendant's decision-making.

### 4.1    First Amendment

The First Amendment establishes a number of rights, including protection for, and from, religion, the freedom of speech, the press, and assembly, and the right to offer complaints to the government. U.S. Const. Amend. I. As relevant to prisoners and parolees, their First Amendment rights may be violated when a government official infringes on their exercise of one of these rights, or when a government official retaliates against them for such exercise. Plaintiff's scattershot allegations do not present any viable First Amendment claims.

As to Plaintiff's first two alleged violations, he does not tie them to any recognized First Amendment theory of liability, and the Court perceives none. "Intimidation" is not, in and of itself, a violation of the First Amendment. Further, on the undisputed facts, Plaintiff refused to sign his

parole rules, and thus was not actually intimidated into doing anything.[5] In the same vein, it is not clear how Defendant would have infringed on Plaintiff's First Amendment rights had she lied about his refusal to sign. In any event, her statement was factually correct.

Plaintiff's next two claims fit, at least arguably, into established theories. The First Amendment protects prisoners' access to the courts. *Henderson v. Frank*, 293 F. App'x 410, 413 (7th Cir. 2008). Plaintiff's third claim and part of his fourth claim invoke this principle. Defendant did not violate it, however, for two reasons. First, Plaintiff is required to show that Defendant's conduct interfered with his ability to litigate non-frivolous legal claims. *Id.* He does not even allege, much less offer evidence of the existence of any such claims. Second, denying Plaintiff access to public libraries and computers did not prevent him from accessing the courts. He was free to file papers in both state and federal courts in person or by mail. *See* Wis. Stat. § 801.18(1)(L) & (3)(c); Gen. L. R. 5(a)(2).

The First Amendment also includes a right to receive information as part of the freedom of speech. *Doe v. Prosecutor, Marion Cnty., Ind.*, 705 F.3d 694, 697-98 (7th Cir. 2013). As explained further below, however, parolees' rights are necessarily restricted as part of their criminal sentence. *See infra* Part 4.2. These restrictions may limit even parolees' constitutional rights so long as they further legitimate state interests, such as public protection and

---

[5]Plaintiff's position on this issue, as with most of his arguments, is plagued by cognitive dissonance. At one point in his brief, Plaintiff contends that Defendant lied about his refusal to sign the rules. (Docket #35 at 5). Just a few pages later, he concedes that he did not sign. *Id.* at 8-9 (Presenting argument that "if Plaintiff *would have* been forced under duress to initial and sign the rules," "[t]o initial and sign the rules, Plaintiff *would have* had to surrender his [rights]," and "Plaintiff's conscious [sic] dictated him not to sign any rules that deprived him of his [rights].") (emphasis added).

reducing the risk of recidivism. *Johnson v. Owens*, 612 F. App'x 707, 711 (5th Cir. 2015). Plaintiff's fourth claim involves a ban on computer use other than for seeking employment. This is permissible because the restriction bears a clear connection to Plaintiff's crimes which involved obtaining and trading child pornography. Defendant, and the State of Wisconsin, have a legitimate interest in preventing Plaintiff from returning to such conduct. *See Johnson*, 612 F. App'x at 714; *see also Patton v. State*, 990 N.E.2d 511, 516 (Ind. Ct. App. 2013) (distinguishing *Doe*, which invalidated a complete ban on social media use by sex offenders, from a restriction on internet use other than for employment).

Plaintiff's final First Amendment claim is another oddity. Neither he nor Defendant cite to any case involving a First Amendment right to certain types of employment. *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) ("[E]mployment-related rights are not fundamental[.]"). Even if the claim were cognizable, Defendant's employment-related restrictions were rationally related to Plaintiff's circumstances, and thus a proper exercise of her discretion. She prohibited Plaintiff, a child sexual predator, from seeking employment where he might come into contact with minors. This was particularly important because he continually downplayed the seriousness of his crime, increasing the likelihood of recidivism.[6]

### 4.2    Fourth Amendment

Parolees may be required to wear GPS location monitoring devices as part of their criminal sentence and, in turn, their supervision. *Samson v.*

---

[6]At multiple points in his briefing, Plaintiff complains that the sex offender treatment programs were "brainwashing," indicating that even today, he does not believe he poses any danger to the community. *See* (Docket #36 at 7 and Docket #35-2 at 4). The reasoned opinions of multiple parole and mental health professionals say otherwise.

*California*, 547 U.S. 843, 850 (2006); *Morrissey*, 408 U.S. at 477 ("[P]arole is an established variation on imprisonment of convicted criminals. . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."); *Belleau v. Wall*, 811 F.3d 929, 931 (7th Cir. 2016). Indeed, the Seventh Circuit has held that *lifetime* location monitoring of sex offenders is constitutionally permissible even for those no longer subject to a term of parole. *Belleau*, 811 F.3d at 937-38. Plaintiff cannot claim, then, that Defendant lacked authority to impose a location monitoring rule in a general sense. *Id.*; *see also* Wis. Adm. Code § DOC 328.04(2)(k).

Plaintiff (in less than clear terms) offers a number of reasons as to why he should not have been placed on location monitoring. As noted in his pleading, he says that Defendant did not give him the "protections" of Section 301.48. This statute did not apply to Plaintiff, however, because it is directed at location monitoring for sex offenders *after* their criminal sentence expires. Acknowledging this in his response, Plaintiff raises other issues. First, he argues that his parole agents did not follow DOC policy when imposing location monitoring, but this argument is directed primarily at his prior agent, not Defendant. Even if this were true, noncompliance with the policy does not automatically violate the Fourth Amendment.

Second, Plaintiff appears to argue that his recidivism risk is lower than what the agents believed, and so location monitoring was unnecessary. Whether a government action violates the Fourth Amendment depends on the "the degree to which it intrudes upon an individual's privacy" versus "the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848.

Here, Plaintiff's privacy rights were curtailed given his status as a parolee, and in light of the disturbing facts detailed above, the state had a keen interest in protecting potential victims from him. Further, Defendant had the authority to impose location monitoring, was vested with discretion to impose it, and did so upon consideration of Plaintiff's individual circumstances. The Court finds no violation of Plaintiff's Fourth Amendment rights.

### 4.3    Eighth Amendment

The Eighth Amendment provides, *inter alia*, that prisoners are entitled to a minimal level of healthcare while in custody. *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016). The Eighth Amendment is violated when the prisoner shows that they "suffered from an objectively serious medical condition," and that "the individual defendant was deliberately indifferent to that condition." *Id.* at 728. In his Amended Complaint, Plaintiff asserts that Defendant bore an obligation, as the person directing that he be arrested for location monitoring violations, to comply with this duty. He maintains that she did not when she failed to provide him his HIV-AIDS medications during the two periods in which he was incarcerated before his revocation.

Plaintiff is wrong, as aptly explained by Judge Griesbach of this District in a case involving probation agents:

> [T]he rule requiring prison and jail officials to provide necessary medical care to inmates flows from the fact that, because of their confinement, inmates are unable to obtain needed medical care on their own. The same fact underlies the more general common law duty of jail and prison officials to provide appropriate medical care for prisoners that is reflected in the American Law Institute's Restatement of the Law of Torts. See RESTATEMENT (SECOND) OF TORTS §

314A(4) (1965). But it is the custodian's duty to provide needed medical or psychiatric care, not the inmate's probation officer. Holding a state probation officer liable for a jail's failure to provide essential mental health care to an inmate on a hold issued by the agent is akin to holding the prosecutor liable for issuing a charge that lands a mentally ill inmate in jail. Probation agents supervise offenders who are released into the community; they do not act as their custodians.

*The Estate of Joshua D. Anderson v. Wis. Mun. Mut. Ins. Co.,* No. 15-CV-124-WCG (E.D. Wis. June 10, 2016), Docket #74 at 8. Judge Griesbach further reasoned that "probation agents, unlike jail and prison officials, do not hold the people under their supervision in physical custody—even when they have made the decision to revoke probation. . . . Once an offender is placed in custody and detained, he is dependent on those who are detaining him to provide essential care." *Id.* at 11.

Though Defendant knew of Plaintiff's condition and his potential lack of medications, she was under no duty to provide them to him. Plaintiff should have turned to the Jail, the entity with physical custody over him, for medical assistance. Indeed, Defendant would have lacked the authority to direct Plaintiff's medical care; had she brought the medications to the Jail, she could not order that he be allowed to take them. Any assistance she offered in obtaining them, mentioned in Plaintiff's brief, was purely gratuitous.

Other problems with Plaintiff's Eighth Amendment claim are causation and damages. In his brief, Plaintiff "alleges that being without his medications caused irreparable and irreversible damage to his fragile compromised immune system and has shortened his life span." *Id.* This statement is not supported by citation to any evidence, either in his brief or

the corresponding proposed fact. *Id.*; (Docket #36 at 12). Without evidence that Defendant's alleged misconduct was the cause of Plaintiff's injury, no jury question is created. Defendant is entitled to summary judgment on the Eighth Amendment claim.[7]

### 4.4    Fourteenth Amendment

Plaintiff's final claim is barred by the *Heck* doctrine. *Heck* "bars civil damages actions where a 'judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence.'" *Henderson v. Bryant*, 606 F. App'x 301, 304 (7th Cir. 2015) (quoting *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)). To prove his equal protection claim, Plaintiff must show "that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). This claim, if proven, would imply that his four-and-a-half-year revocation sentence lacked a rational basis and was therefore inappropriate. Plaintiff's response brief states in conclusory fashion that he does not challenge the validity of his sentence, but he does not meaningfully explain why. The Court gathers that Plaintiff takes issue with the reason why Defendant sought a revocation of that length (in fact she had asked for six years) but that is of no moment. Whatever the reasons for revocation announced by Defendant or the administrative law judge who issued the sentence, success on Plaintiff's claim would imply that the sentence was too long. This is what *Heck* forbids.

---

[7]In his response, Plaintiff focuses on the lack of medication during an October 2013 incarceration at the Milwaukee Secure Detention Facility ("MSDF"). (Docket #35 at 14-18). Defendant asserts that this incident was not pleaded. (Docket #40 at 4). Regardless of the state of the pleadings, the analysis above would apply equally to Plaintiff's time in the MSDF.

5. **CONCLUSION**

On the undisputed facts presented, each of Plaintiff's claims fail and summary judgment must be granted in Defendant's favor. This action will, therefore, be dismissed with prejudice. With the dismissal of this case, Plaintiff's January 12, 2018 motion for injunctive relief must be denied as moot. (Docket #39).

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #25) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for injunctive relief (Docket #39) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of January, 2018.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge